# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00541-CV

### In re Commitment of Juan Carlos Delarosa

### FROM THE 155TH DISTRICT COURT OF FAYETTE COUNTY
### NO. 2019V-277, THE HONORABLE JEFF R. STEINHAUSER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In this civil commitment proceeding, the State petitioned to have appellant Juan Carlos Delarosa declared a sexually violent predator under the Sexually Violent Predator Act. *See* Tex. Health & Safety Code §§ 841.001–.153 (the Act). After a jury found beyond a reasonable doubt that Delarosa was a sexually violent predator under the Act, the trial court rendered a final judgment on the verdict and entered an order of civil commitment. Delarosa appeals, bringing two issues about the sufficiency of the evidence to support the jury's finding beyond a reasonable doubt that he is a sexually violent predator. *See id.* §§ 841.003, 841.062. We affirm.

## BACKGROUND

While in his 30s, Delarosa sexually assaulted two of his nieces, C. and G.,[1] who were then about seven or eight years old, over the course of some years. After a delayed outcry by the girls, Delarosa pleaded guilty to one count of aggravated sexual assault of a child and two

---

[1] We refer to C. and G. by their first initials to protect their identities.

counts of indecency with a child by contact. His three judgments of conviction were all signed in 2005, and he received 15 years in prison for each conviction.

Delarosa was released on parole in early 2017, and both while he was in prison and after his release, he received forms of counseling or treatment. In some of his treatment sessions, Delarosa admitted to additional sexual offenses, including molesting a four- or five-year-old girl when he was a teenager and getting "away with it" and also a five- or six-year-old boy and similarly escaping accountability. Delarosa in his testimony agreed that he is a sex offender and even admitted that he will "always need treatment."

In summer 2018, Delarosa's parole was revoked because he had child pornography on his phone, and he was sent back to prison.

As Delarosa's ultimate release from prison approached, the State petitioned the trial court to civilly commit Delarosa as a "sexually violent predator" under the Act. *See id.* § 841.003(a). The parties tried to a jury whether Delarosa is a sexually violent predator. At trial, the State called Dr. Darrel Turner, who is a psychologist who evaluated Delarosa, and then Delarosa. The court admitted exhibits offered by the State, including Dr. Turner's CV and evidence of Delarosa's convictions for the sex offenses against his nieces and for other offenses. The jury unanimously found that Delarosa is a sexually violent predator, and the trial court rendered a final judgment and order of civil commitment accordingly.

**APPLICABLE LAW AND STANDARD OF REVIEW**

Chapter 841 provides for the involuntary "long-term supervision and treatment of sexually violent predators." *See id.* §§ 841.001, 841.007; *see also id.* §§ 841.002–.153; *In re Commitment of Stoddard*, 619 S.W.3d 665, 669 (Tex. 2020). Proving that a person is a sexually

violent predator requires proof of two elements: (1) the person is a "repeat sexually violent offender," and (2) the person "suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." Tex. Health & Safety Code § 841.003(a); *Commitment of Stoddard*, 619 S.W.3d at 669. The burden of proof for the finding that a person is a sexually violent predator is "beyond a reasonable doubt." Tex. Health & Safety Code § 841.062(a); *Commitment of Stoddard*, 619 S.W.3d at 670.

"'Behavioral abnormality' means a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." Tex. Health & Safety Code § 841.002(2). "'Predatory act' means an act directed toward individuals, including family members, for the primary purpose of victimization." *Id.* § 841.002(5). And "sexually violent offense" includes the offenses of indecency with a child by contact and aggravated sexual assault of a child. *See id.* § 841.002(8)(A); Tex. Penal Code §§ 21.11(a)(1), 22.021(a)(1)(B), (a)(2)(B).

Because of the heightened burden of proof, appellate review of the sufficiency of the evidence to support a finding that a person is a sexually violent predator differs from the usual sufficiency review in civil appeals. The legal-sufficiency standard here requires deciding "whether, after viewing the evidence in the light most favorable to the [petitioner], any rational trier of fact could have found the essential elements . . . beyond a reasonable doubt." *See Commitment of Stoddard*, 619 S.W.3d at 675 (internal quotation omitted). The factual-sufficiency standard requires deciding "whether, on the entire record, a reasonable factfinder could find beyond a reasonable doubt that the defendant is" a sexually violent predator. *Id.* at 668. "[T]he appellate court may not usurp the jury's role of determining the credibility of the witnesses and

3

the weight to be given their testimony . . . [and] must presume that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so." *Id.* "If the remaining evidence contrary to the finding is so significant in light of the entire record that the factfinder could not have determined beyond a reasonable doubt that its finding was true, the evidence is factually insufficient." *Id.*

"[I]n both types of review the appellate court may not ignore 'undisputed facts that do not support the finding' and must otherwise presume the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so." *Id.* at 676 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). But the two types diverge over how they treat "disputed evidence that a reasonable factfinder could *not* have credited in favor of the finding." *Id.* "In a legal-sufficiency review, the court disregards such evidence in determining whether a rational factfinder could find the statutory . . . elements met beyond a reasonable doubt." *Id.* But "[i]n a factual-sufficiency review, the court considers whether that evidence, in light of the entire record, is so significant that the factfinder could not have determined beyond a reasonable doubt that the statutory elements were met." *Id.*

## DISCUSSION

Delarosa's first issue concerns the legal sufficiency of the evidence to support the jury's finding that he is a sexually violent predator. He does not challenge the element that he "is a repeat sexually violent offender."[2] *See* Tex. Health & Safety Code § 841.003(a)(1). He instead

---

[2] There was evidence proving that he is a repeat sexually violent offender because there was evidence of his convictions and sentences for aggravated sexual assault of a child and indecency with a child by contact. *See* Tex. Health & Safety Code §§ 841.002(6), (8)(A), 841.003(b); Tex. Penal Code §§ 21.11(a)(1), 22.021(a)(1)(B), (a)(2)(B).

challenges the element that he "suffers from a behavioral abnormality that makes [him] likely to engage in a predatory act of sexual violence," *see id.* § 841.003(a)(2), for the most part by attacking the expert-witness testimony given by Dr. Turner.

But only some of Delarosa's arguments about Dr. Turner's testimony are reviewable here. *See In re Commitment of Cordova*, 618 S.W.3d 904, 917 (Tex. App.—El Paso 2021, no pet.) ("At the outset, we hold that Cordova cannot challenge the reliability of the State's experts' opinions on appeal because he did not object on that basis in the trial court." (citing *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009))). Delarosa only challenged the State's evidence with a post-verdict motion for new trial. Because he did not object, or file any pre-trial motion, to preserve an expert-testimony challenge, he forfeited any challenge to the reliability of Dr. Turner's expert opinions or methodology. "When the expert's underlying methodology is challenged, the court 'necessarily looks beyond what the expert said' to evaluate the reliability of the expert's opinion." *Pike v. Texas EMC Mgmt., LLC*, 610 S.W.3d 763, 786 (Tex. 2020) (internal quotation omitted) (quoting *Coastal Transp. Co. v. Crown Cent. Petrol. Corp.*, 136 S.W.3d 227, 233 (Tex. 2004)). Thus, "when a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis." *Id.* (internal quotation omitted) (quoting *Coastal Transp.*, 136 S.W.3d at 233). This means that "when an expert opinion 'is admitted in evidence without objection, it may be considered probative evidence even if the basis of the opinion is unreliable.'" *Id.* (quoting *Pollock*, 284 S.W.3d at 818).

On the other hand, the motion for new trial preserved challenges to the legal and factual sufficiency of the evidence, which can encompass challenges that Dr. Turner's testimony was speculative or conclusory. "[A] party need not object in order to challenge . . . expert

5

testimony as conclusory or speculative on its face; it need only preserve a challenge to the legal sufficiency of the evidence, which it may do post-verdict." *Id.* Because Delarosa preserved his legal-sufficiency challenge through his motion for new trial, *see In re D.T.*, 625 S.W.3d 62, 75 & n.8 (Tex. 2021), we may review his arguments that Dr. Turner's testimony was conclusory or speculative. This kind of review "is restricted to the face of the record." *See Pike*, 610 S.W.3d at 786 (internal quotation omitted) (quoting *Coastal Transp.*, 136 S.W.3d at 233).

Conclusory-evidence or speculative-evidence arguments concern the basis for the expert's opinions and the connection between the basis and the opinions. Expert testimony "is conclusory (and an objection unnecessary)" either when "no basis for the opinion is offered" or when "'the basis offered provides no support' for the opinion." *Id.* at 787 (internal quotation omitted) (quoting *Pollock*, 284 S.W.3d at 818). "[I]t is the basis of the witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law; a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness." *Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 156 (Tex. 2012) (emphasis omitted) (internal quotation omitted) (quoting *Coastal Transp.*, 136 S.W.3d at 232). "If an expert 'br[ings] to court little more than his credentials and a subjective opinion,' his testimony will not support a judgment." *Id.* (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex. 1997)). An expert's testimony "is conclusory as a matter of law if he 'simply state[s] a conclusion without any explanation'" and "is speculative if it is based on guesswork or conjecture." *Id.* (quoting *Arkoma Basin Expl. Co. v. FMF Assocs. 1990–A, Ltd.*, 249 S.W.3d 380, 389 (Tex. 2008)).

We thus address only Delarosa's arguments that may be reviewed even without a timely objection or motion. *See Commitment of Cordova*, 618 S.W.3d at 917 ("Our review of his legal-sufficiency issue is therefore restricted to determining only whether there is some basis to

support the State's experts' opinions such that the opinions at issue were not conclusory."). To evaluate the bases for Dr. Turner's opinions, we first review the evidence about Dr. Turner's background, credentials, and methodology here. He testified that he is a clinical psychologist licensed in Texas and Louisiana and has a bachelor's degree in psychology, a master's degree in counseling psychology, and a Ph.D. in clinical psychology. His CV, which lists his many publications and the invitations he has received to give presentations or offer consultation and recounts his years of research and teaching experience, was admitted into evidence.

To obtain his licenses, Dr. Turner had to pass a test akin to a board-certification exam, pass separate tests about the laws of the respective jurisdictions whose licenses he sought, and undergo approximately 2000 hours of supervision by an already-licensed professional. He has co-authored "peer-reviewed publications regarding sexual offending" with "leading experts in the area of forensic psychology." He explained that he has given many presentations "in various areas, primarily risk assessment of sex offenders," and has treated sex offenders in his private practice.

On top of his clinical-psychology work, Dr. Turner has also practiced forensic psychology for about 13 years, the first five of which were under supervision. Forensic psychology, he testified, is basically "using psychology in the courtroom." In that field, he has offered testimony for both prosecutors and defense attorneys and by court appointment, and he has testified in both state and federal courts and in both civil and criminal cases. He has taken continuing-education courses in forensic psychology and drew on that discipline to offer his opinions about Delarosa.

Dr. Turner also explained to the jury the steps he took to prepare his opinions about Delarosa. For one thing, he reviewed records: "police investigative reports, supplemental narratives on those investigative reports, court documents, indictments, statements . . . made in the

7

course of the investigation by alleged victims at that time and by Mr. DeLaRosa, information about his behavior while incarcerated, some medical records, his deposition and some notes from his parole hearing." These, he said, are the same kinds of records that are typically relied on by experts in the field and allowed him to learn about Delarosa's past "to help us look at what his behavior is now" because "we're looking at whether he has a condition that makes him likely to commit more sex offenses." Dr. Turner also interviewed Delarosa in person, for about two hours, and administered a Static 99R test, discussed in more detail below, and a test for helping to discover whether the subject is a psychopath. Dr. Turner told the jury that two hours was an adequate amount of time to fully conduct the interview and is a normal length of time for these kinds of evaluations. And he explained that the interview was "in accordance with [his] training as a psychologist" and was done "in accordance with the accepted standards in the field of forensic psychology." The records review and the interview, coupled with his education, training, and experience, Dr. Turner said, allowed him "to find based on a reasonable degree of scientific certainty that" Delarosa "certainly does suffer from a behavioral abnormality that predisposes him to engage in predatory acts of sexual violence."

Dr. Turner arrived at his opinions by searching for certain "risk factors" and "protective factors" exhibited by Delarosa. Dr. Turner explained to the jury that "[r]isk factors are variables or things that if they are present in a sex offender, then that sex offender is more likely to reoffend than a sex offender who does not have that factor present." Risk factors are "research based." And the two risk factors that "correlate the most with sexual reoffending," especially when both are present, are "antisociality and sexual deviance."

Dr. Turner opined that Delarosa exhibited the antisociality risk factor for many reasons. First, Dr. Turner diagnosed Delarosa with antisocial personality disorder (APD) and

8

judged Delarosa to have "high a degree of psychopathic characteristics." Dr. Turner made the APD diagnosis by applying criteria from the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), which he told the jury is an authoritative text in his field and "a manual . . . designed to be used by psychiatrists and psychologists to help them make diagnoses and to look at how prevalent a disorder is, some of the effective ways of treating the disorder and the criteria for having that disorder." According to Dr. Turner, APD involves

> a chronic problem obeying the rules, someone that's out for themselves, someone that doesn't mind stepping on other people to get to the top, someone that generally doesn't feel any remorse or empathy for the people that they hurt because they feel that they're entitled to get all of that anyway.

He diagnosed Delarosa with APD based on his drug use from a young age, including marijuana and heroin; his childhood hobby of "collecting skeletons of dead animals and rearranging the bones"; his "pathological lying" about many things, including the sexual offenses against his nieces and his early drug use[3]; his criminal offenses, which included the sexual offenses plus drug trafficking, possession of marijuana, and possession with intent to deliver; his parole violation, which led to revocation of his parole; and another childhood incident, in which he "burn[ed] some lumber down" in an act of revenge and about which his stories changed over time. Dr. Turner characterized the skeleton-collecting as involving "a dark element"—a child's "associating himself with death and decay" as a hobby.

Other facts bolstered Dr. Turner's APD diagnosis. Delarosa said that his plans to make a living after release from prison involved creating a taco-truck business. However, he knew

---

[3] More specifically, Dr. Turner said that in his records review and in his interview with Delarosa, Delarosa's retellings of past events, including how he abused C. and G., would often change, even in the span of just a few minutes.

9

that he could not be near children with the business, so his solution was to put the business in someone else's name. This solution concerned Dr. Turner because it struck him as an example of trying to "get by the system and sneak by"—much like someone with "a chronic problem obeying the rules" would exhibit. And Delarosa's crimes against his nieces suggested to Dr. Turner someone who is willing to hurt others to benefit himself.

On top of the antisociality, Dr. Turner opined that Delarosa was sexually deviant, meaning that he has "a sexual attraction that would require victimizing another human being in order to satisfy." This opinion was based on Delarosa's having sexually victimized multiple people, specifically prepubescent girls, with at least one of the instances involving violence. That is, in one of the abusive incidents against G., Delarosa held her down by her wrists, she cried, and he told her to "shut up."

Important to Dr. Turner was that not only did Delarosa have pedophilic disorder under the DSM-5's criteria, but he also acted on it many times and minimized the victimization his actions caused. For example, Delarosa told Dr. Turner in their interview that the abuse resulted from the seven-to-eight-year-old nieces' enticing Delarosa into sexual acts so they could learn about what they had watched in pornographic movies. Delarosa, according to Dr. Turner, even described the sexual abuse as if it were "light-hearted and like a game and like teaching." These attitudes suggested to Dr. Turner a lack of remorse or empathy, even a callousness, in Delarosa. Victim-blaming of children is common to people with pedophilic disorder who offend, Dr. Turner explained, because they attribute to children the same kinds of sexual thoughts and desires that adults have and act on those perceptions.

Beyond the incidents of abuse against C. and G., Delarosa also, by his own admission, sexually abused a third niece, who was then twelve years old. Dr. Turner, in his review

10

of the records, discovered that Delarosa had admitted to abusing the third niece, and the abuse shared similarities with the descriptions of what he was doing to C. and G. over roughly the same period. Dr. Turner opined that Delarosa was grooming his victims by treating the sex acts like games or teaching exercises for the children. Beyond all this, Delarosa separately admitted to fantasizing about children while masturbating and to sexually assaulting victims besides his nieces.

In all, Dr. Turner testified that Delarosa exhibited the two most prominent risk factors associated with the likelihood of committing predatory acts of sexual violence, *cf.* Tex. Health & Safety Code § 841.003(a)(2)—antisociality and sexual deviance. Dr. Turner opined that this combination would affect Delarosa's emotional or volitional capacity, *cf. id.* § 841.002(2), "because he's sexually attracted to children, female prepubescent children"; "he has acted out multiple times against several victims"; and "he's been incarcerated multiple times now as a result of that," all leading Dr. Turner to conclude that Delarosa "is someone that's having difficulty controlling their behavior as it pertains to those sexually deviant interests." This combination of traits is "significant when determining if someone has [a] behavioral abnormality," said Dr. Turner. He expanded on the topic:

> [T]o me, that's really kind of the key to the whole thing. If someone is antisocial, then they don't have a problem internally with guilt and remorse and all of those things. They feel entitled to acting out and taking what they want from this world, whether it be sex, money, whatever.
>
> So if someone experiences . . . a sexual deviant interest but is not an antisocial individual, then they may just never act on that impulse. They may have an attraction to children and never act on it because they are not antisocial enough to hurt someone and live with themselves.
>
> But when you have someone that has a sexually deviant interest that requires victimizing someone to satisfy and they don't care about hurting other people and they don't have guilt because they don't empathize with other people, then that's the recipe for someone with a behavioral abnormality: Someone that has

11

difficulty controlling their behavior when it comes to their sexual urges, and they become a risk to other people. To me that sums it all up.

Dr. Turner opined that Delarosa suffered from the kind of behavioral abnormality required by Chapter 841, *cf. id.* §§ 841.002(2), 841.003(a)(2), because Delarosa exhibited the main risk factors of antisociality and sexual deviance, plus supporting risk factors of self-reported intoxication while offending, which supports a higher likelihood to reoffend; offending when and where he could be easily discovered because it was near his family's home (described by Dr. Turner as brazenness); and offending with another child in the room (described as more brazenness).

From all this, we conclude that the evidence was neither speculative nor conclusory and was thus legally sufficient to support a finding beyond a reasonable doubt that Delarosa "suffers from a behavioral abnormality that makes [him] likely to engage in a predatory act of sexual violence." *See id.* § 841.003(a)(2). Dr. Turner provided the factual basis for all his opinions—he reviewed records about Delarosa and conducted an in-person interview with him. These provided Dr. Turner with, he testified, "the underlying facts and details" of Delarosa's offenses, which reveal to a psychologist like Dr. Turner the subject's risk factors and protective factors. The risk factors are backed by research, as Dr. Turner told the jury. For the two main risk factors that Dr. Turner identified, he explained in detail how they combine in a person like Delarosa to lead to "behavioral abnormality" and committing "predatory acts," as Chapter 841 defines those terms. Specifically, Dr. Turner explained how Delarosa's antisociality and sexual deviance combine to affect his emotional or volitional capacity and predispose him to committing sexually violent offenses, which likely would cause him to menace children in the future. *See id.* § 841.002(2). And Delarosa's heightened antisociality, as explained by Dr. Turner, gave a reason for why he likely would commit acts "for the primary purpose of victimization"—"predatory acts,"

12

*see id.* § 841.002(5)—because Delarosa does not empathize with or have remorse for the victims that he uses to gratify himself. Dr. Turner also explained that his diagnoses were made under the DSM-5, which is standard for his field. We thus have evidence of the bases and support for Dr. Turner's opinions. *See Pike*, 610 S.W.3d at 786–87; *Natural Gas Pipeline*, 397 S.W.3d at 156. The evidence was thus legally sufficient to support the jury's finding beyond a reasonable doubt. *See Commitment of Stoddard*, 619 S.W.3d at 675.

Delarosa's three sets of arguments to the contrary do not persuade us. First, he faults Dr. Turner for "cit[ing] no books, articles, journals, or even other forensic psychiatrists who practice in this area." But this is not the case, at least because Dr. Turner explained how he arrived at his supporting diagnoses by reference to the DSM-5 and testified that the risk-factor approach in his methodology was backed by research. *See Bustamente v. Ponte*, 529 S.W.3d 447, 465 (Tex. 2017) (evidence legally sufficient when experts' testimony explained applicable standards and how they applied to case and was supported by clinical experience and in-person examination of subject); *In re Commitment of Jurischk*, No. 03-18-00670-CV, 2019 WL 2308594, at *5 (Tex. App.—Austin May 31, 2019, no pet.) (mem. op.) (evidence legally sufficient in part because psychologist's testimony "present[ed] a reasoned judgment based on established research and techniques for [psychologist's] profession and not . . . unsupported assertion, or mere *ipse dixit*"). But beyond this, the legal-sufficiency test is not so stringent as to require citations to books, articles, journals, or other experts. Instead, what is needed is the basis for the testifying expert's opinions, which here includes the review of records, in-person interview, and Dr. Turner's own background and experiences, and support for how the bases connect to the opinions. *See Pike*, 610 S.W.3d at 786–87; *Natural Gas Pipeline*, 397 S.W.3d at 156; *see also Windrum v. Kareh*, 581 S.W.3d 761, 770–71 (Tex. 2019) ("He failed to cite any literature in support of his ultimate

conclusion . . . . However, in addition to providing his resume and describing his experience, Dr. Parrish provided enough reasons for his opinion. While Dr. Parrish undoubtedly could have provided more solid support for his conclusion, he provided a basis for his opinion which was more than mere *ipse dixit*."). The evidence here was more than just Dr. Turner's say-so.

Next, Delarosa argues from the results on an actuarial tool called the "Static 99R" and Dr. Turner's criticism of it. The Static 99R, as Dr. Turner testified, places sex offenders in a score range from least likely to reoffend to most based on several factors exhibited by, or present in, the offender. To do this, the creators of the Static 99R used a sample set of thousands of sex offenders and identified factors present in those people that correlate with later arrests or convictions. Dr. Turner scored Delarosa as a below-average risk of reoffending on the Static 99R, but Dr. Turner also explained flaws in the Static 99R that hamper its usefulness. The flaws stem mainly from the fact that sex offenses so often go unreported, with the result that too many offenses do not get captured as arrests (or rearrests) and convictions (or reconvictions).

Delarosa argues that the Static 99R was the only statistical evidence in the case and that because Dr. Turner's opinions conflicted with it, the evidence overall was legally insufficient. But resort to statistics is not required of all experts. For example, "[e]xperience alone may provide a sufficient basis for an expert opinion," and "medical literature," or the equivalent depending on the field of expertise, "is not necessary to support an expert's opinion, although it tends to strengthen the bases for the opinion and therefore is preferred." *See Windrum*, 581 S.W.3d at 769 (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998)). Notably here, the issues inherent in determining the existence of the kind of behavioral abnormalities required by Chapter 841 must leave room for expert judgment calls: "commitment proceedings are decided on evidence that concerns the application of a 'soft' science that calls for the exercise of

14

a considerable amount of intuitive judgment on the part of experts with specialized training." *See In re Commitment of Day*, 342 S.W.3d 193, 213 (Tex. App.—Beaumont 2011, pet. denied). Along those lines, Dr. Turner explained why the Static 99R is flawed. The incidence of reoffending within the control set, according to Dr. Turner and several of his psychologist colleagues, unrealistically underestimates how often reoffending truly occurs because only "[a] very small percentage" of sex offenses "are reported." Dr. Turner said, "[B]etween 60 to 80 percent of children who are sexually abused don't say anything, don't report it until adulthood." Because the Static 99R has these flaws as explained by Dr. Turner, disagreeing with Delarosa's Static 99R results—in other words, believing instead that he is indeed at a higher risk to reoffend— does not render legally insufficient the other bases supporting Dr. Turner's opinions. The results on the Static 99R simply provided the jury with conflicting evidence to weigh, and it was within reason for the jury to resolve this conflict in favor its finding. *See Commitment of Stoddard*, 619 S.W.3d at 676.

Finally, Delarosa attacks some of Dr. Turner's statements or assumptions individually. For example, he argues that the psychologist's views about Delarosa's childhood skeleton-collecting hobby amounted to no evidence at all because there were other ways to view this information—for example, a burgeoning anthropologist would enjoy collecting skeletons. But in a legal-sufficiency review, we view the evidence in the light most favorable to the jury's finding. *See id.* at 675–76; *In re Commitment of Delacruz*, No. 03-19-00420-CV, 2021 WL 1313347, at *1 (Tex. App.—Austin Apr. 8, 2021, pet. denied) (mem. op.). Under that standard, we are to view the childhood hobby as Dr. Turner said the jury should and not instead as evidence of a future anthropologist at work because the jury reasonably could have viewed the evidence in that way.

To sum up, we hold that Dr. Turner's testimony, which was neither speculative nor conclusory, and the exhibits admitted as evidence allowed a rational trier of fact to have found beyond a reasonable doubt, *see Commitment of Stoddard*, 619 S.W.3d at 675; *Commitment of Delacruz*, 2021 WL 1313347, at *1, that Delarosa suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence, *see* Tex. Health & Safety Code § 841.003(a); *Commitment of Stoddard*, 619 S.W.3d at 669. This and the lack of any challenge on appeal to the "repeat sexually violent offender" element mean that the evidence was legally sufficient to support the jury's finding beyond a reasonable doubt that he is a sexually violent predator. We thus overrule his first issue.

Delarosa's second issue concerns the factual sufficiency of the evidence and does not challenge that he is a repeat sexually violent offender. We now review the rest of the evidence, including disputed evidence that could not have been credited in favor of the jury's finding, and decide whether the evidence contrary to the finding is so significant that the jury could not have determined beyond a reasonable doubt, *see Commitment of Stoddard*, 619 S.W.3d at 668, that Delarosa suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence, *see* Tex. Health & Safety Code § 841.003(a); *Commitment of Stoddard*, 619 S.W.3d at 669.

First, Dr. Turner identified protective factors in Delarosa. Protective factors work opposite to risk factors—they lower the likelihood that a sex offender will reoffend. Dr. Turner identified Delarosa's protective factors as his advanced age, his not having preyed on victims who are strangers to him, and his relative lack of troublemaking in the prison system. Undercutting the protective value of his age, however, was the fact that his parole had recently been revoked for possession of child pornography. While older offenders tend to grow less likely to reoffend, the

16

relatively recent possession of child pornography suggested to Dr. Turner that Delarosa is not growing less likely to reoffend. And undercutting his good behavior in the prison system is his admission on cross-examination that he has broken some rules while in prison.

Delarosa points to other evidence that he says supports his factual-sufficiency challenge. He argues that "[t]he most significant disputed fact that a reasonable factfinder could not have credited in favor of the verdict is" the claim that it was substantiated that his parole was revoked because of possessing child pornography. He says that there was no testimony or documentary evidence showing that to be the reason his parole was revoked. But this argument on appeal conflicts with his trial testimony: when confronted with the allegation that he possessed child pornography on his phone, his explanation was that he accidentally clicked on a pop-up of "an image of a porno actress . . . doing, you know, her moaning and whatever" while he was trying to vote online for a child competitor on *America's Got Talent*. The jury could have reasonably interpreted this explanation not as a denial that there had ever been child pornography on his phone but as an attempted, but untruthful, justification for why it was there.

He raises three other disputed facts as ones that a reasonable jury could not have credited in favor of the verdict. He says that Dr. Turner's criticism of the Static 99R as a tool fails to undermine his low score and its meaning:

> [T]he Static-99 cannot be based on those offenses that are not reported and offenders who are not caught. . . . Unreported, uncaught, or unpunished criminals cannot be assessed and quantified, but that is no reason to throw out the empirical research on the ones who can be studied, which appears to be what Dr. Turner is advocating.

This argument misperceives Dr. Turner's position, which is that if sexual offending is underreported, then there could be more factors that correlate with reoffending beyond those that

17

the Static 99R recognizes and maybe that are even more predictive than the Static 99R's are. We need not wade into this argument for experts; we need only say that a reasonable jury could have discounted the Static 99R as Dr. Turner said he does.

Delarosa next points out his admitting to his past crimes, and expressing remorse, during his trial testimony. But Dr. Turner's testimony provided a reasonable basis for the jury to discount Delarosa's testimony on this account because the psychologist relied on Delarosa's minimizing of what he had done. To Dr. Turner, even if Delarosa admitted to his crimes against his nieces, he still blamed the seven-to-eight-year-olds for starting the sex acts, which shows pedophilic tendencies and a lack of remorse for having hurt the children. The jury reasonably could have believed as Dr. Turner did.

Delarosa then re-raises his view of the childhood skeleton-collecting hobby, calling it mere "anatomical inquisitiveness." But Dr. Turner could apply his experience and training when interpreting Delarosa's behavior, and the jury reasonably could have believed the psychologist's explanation, in this way reasonably resolving a dispute in how that evidence should be viewed.

Finally, Delarosa raises what he believes are undisputed facts contrary to the verdict that a reasonable factfinder could not have ignored. He says he had no "disciplinaries" while in prison, but he elsewhere admitted to breaking prison rules. He says he had no violent convictions, but at least one of the assaults against G. did involve violence, according to Dr. Turner. He says that the assaults for which he was convicted occurred decades ago, and while true enough, the much more recent episode of possessing child pornography while on parole brings Delarosa's offending conduct nearer in time to the present. And he relies on the Static 99R result showing that he is a below-average risk to reoffend. For the reasons already explained, the jury reasonably could have discounted what the Static 99R signified about Delarosa.

18

After reviewing all the evidence, we conclude that the evidence contrary to the jury's finding is not so significant that the jury could not have determined beyond a reasonable doubt, *see Commitment of Stoddard*, 619 S.W.3d at 668, that Delarosa suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence, *see* Tex. Health & Safety Code § 841.003(a); *Commitment of Stoddard*, 619 S.W.3d at 669. This conclusion plus the unchallenged finding that Delarosa is a repeat sexually violent offender means that the finding that he is a sexually violent predator was supported by factually sufficient evidence. We thus overrule his remaining issue.

## CONCLUSION

We affirm the trial court's judgment.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Kelly and Smith

Affirmed

Filed: August 17, 2022

19